ELLA PIPES CLINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. D. CLINE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6929, 6930. Promulgated March 18, 1929.

*Harry C. Weeks, Esq.,* for the petitioners.

*A. George Bouchard, Esq.,* and *M. E. McDowell, Esq.,* for the respondent.

OPINION.

GREEN: We will discuss the issues here involved in the order previously mentioned.

The first issue is whether, in determining gain or loss on a sale in 1920 of an oil and gas lease and equipment acquired in 1919, the basis thereof should be reduced by the amount of depletion and depreciation sustained. The petitioners, in their reply brief, concede that this issue should be decided against them upon the authority of *United States* v. *Ludey*, 274 U. S. 295, and we so decide.

The second and third issues relate to the proper determination of Cline's distributive share of the net income of the two partnerships, Whitener & Shinholt and H. B. Shinholt & Co. for the year 1920. Cline contends that the income of these partnerships should have been computed upon the cash receipts and disbursements basis for the year 1920, instead of the accrual basis as determined by the respondent. We have found as a fact that the books were not kept upon either of those bases, in the commonly accepted meaning of those terms, or in accordance with any recognized accounting practice. Upon such facts, section 212 (b) of the Revenue Act of 1918 is applicable, wherein it is provided, *inter alia:*

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income.

The burden is upon the petitioners to show that the basis and manner of the respondent's determination does not clearly reflect the income. This we think they have failed to do. The greater portion of the petitioners' argument is based upon an erroneous premise, namely, that the respondent did determine the income of Whitener & Shinholt for the period ending December 31, 1919 (which period is not before us), upon a cash basis. The revenue agent who examined the partnership's books for this period testified, as petitioners' witness, that in order to determine the income of Whitener & Shinholt for the period ending December 31, 1919, upon a cash basis it would have been necessary for the respondent to eliminate the accounts payable accrued by the partnership as of December 31, 1919. As this was not done it is improper to say that the respondent's determination for that period was upon the cash basis. The respondent used the accrual method in the computation of income for both years.

The determination of the respondent on these two issues should not be disturbed. Cf. *Stuart A. Russell*, 12 B. T. A. 56.

The fourth issue involves the determination of the correct net income for the year 1920 of the partnership of Norton & Cline, in which Cline owned a one-fifth interest. Before considering the merits of this issue, we will dispose of the motion to amend the petition filed by petitioners' counsel on September 17, 1927, and set down for hearing at Washington on October 25, 1927. The petitioners were not represented at the hearing on the motion which, after being opposed by counsel for the respondent, was taken under advisement. As appears from the bottom of page seven of petitioners' reply brief, the motion to amend the petition respecting the Norton & Cline issue was filed by petitioners' counsel " to avoid any misconception of the pleadings." The assignment of error in the original petitions pertaining to the Norton & Cline issue is that, " The taxpayer's distributive share of the profit of the partnership of Norton & Cline was incorrectly determined." Whether we grant or deny the motion will not affect our decision on this assignment of error. The motion merely clarifies an issue already made, and the motion is granted.

As set out in our findings of fact, the respondent has treated the transaction between Norton & Cline and the Veritas Oil Corporation as a sale occurring in 1919. Because that provision of the contract providing for the payment of $1,750,000 out of four-fifths of seven-eighths of all oil produced had no fair market value, he determined the profit on the " return of capital " theory which, as we said in *Garber* v. *Commissioner*, 11 B. T. A. 979, " contemplates the receipt by the taxpayer of his entire cost before there can be taxable income." He further held that the excess over the one-fifth of seven-eighths of the oil produced of the development and operating expenses paid by the partnership after the sale was not a proper deduction by the partnership, but should have been set up on its books as an account receivable due from the Veritas Oil Corporation. The petitioners do not take issue with the respondent as to his determination of the year in which the sale was made, or as to his use of the " return of capital " theory in determining the profit, which theory we have applied to similar issues where part of the consideration for the sale had no fair market value. See *Joliet-Norfolk Farm Corporation*, 8 B. T. A. 824. But the petitioners do object to the inclusion, as a part of the consideration received in 1920, of the two notes totaling $200,000, which had a fair market value equal to their face when received in 1919 and on which $100,000 was actually paid during 1919. They further contend that because the partners at no time ever believed that one-fifth of the oil produced from the two tracts would ever pay the development and operating costs provided for in the sale agreement, such excess of the costs over the one-fifth of seven-eighths of the oil should

either be considered as a part of the cost of the property sold in determining the profit from the sale, or as " an allowable deduction at the time when it becomes certain that there will never be any excess of receipts over future operating expenses to apply upon the then existing deficit." (Petitioners' brief.) The petitioners' proof discloses two minor errors in the respondent's computation of profit respecting " commissions paid " and " other deductions," facts concerning which we have set out in our findings and which will appear presently in our computation of net income of this partnership for the year in question.

We have found as a fact that the two notes totaling $200,000 had a fair market value equal to their face when received in 1919. The respondent was in error in including them as a part of the consideration received in 1920.

Addressing ourselves to the excess costs of development and operating expenses made in accordance with the sale agreement over the one-fifth of seven-eighths of the oil produced, we are confronted with the following problem. A partnership was organized in 1919. It purchased a lease on two tracts of land for a cash consideration of $271,000. It proceeded to develop the land for oil and gas. During the course of development, it, through one of its partners, entered into an agreement with one Steger where, in consideration of $100,000 then paid, Steger was given an option to buy, on or before the fifth day after the completion of the fifth well, the lease, the leasehold estate, and all right, title and interest therein owned by the partnership, for a total consideration of $2,250,000, to be paid in cash, notes, and oil produced. Steger organized a corporation and on the fifth day after the completion by the partnership of the fifth well, to wit, August 22, 1919, the partnership sold, transferred, conveyed, and assigned to the corporation " all and singular all of the oil and gas lease and leasehold estate, right, title and interest owned by the parties of the first part " in the two tracts for a total consideration of $2,250,000, payable as follows:

| | |
|---|---|
| Cash _____ | $300, 000 |
| 60-day note_____ | 100, 000 |
| 90-day note_____ | 100, 000 |
| First four-fifths of seven-eighths of all the oil produced_ | 1, 750, 000 |
| | 2, 250, 000 |

The contract of sale then provided (and here is where the difficulty arises) that the property and the development and operation thereof should be under the joint management and control of both parties; that all costs of development and operation of the property made or to be made subsequent to the day after the fifth well was completed were to be paid by the purchaser out of the remaining one-fifth of seven-eighths of the oil produced; and that the

seller was to retain a vendor's lien on the property and receive credit from the pipe line runs for the one-fifth of seven-eighths of the oil produced, until all such costs had been paid. But the parties did not act in strict accordance with the agreement. The petitioners at no time believed that there could be produced from the lease sufficient oil to pay the remaining cost of $1,750,000 plus the costs of further development and operation of the property. They considered that they had made a very favorable contract and that in substance the buyer was virtually making a " donation " to them of the $500,000 paid in cash and notes. The parties interested in the corporation evidently soon became aware of their unfortunate purchase and directed their interests to other enterprises. The partnership, however, continued to operate and develop the property, since under the agreement it was entitled to the full seven-eighths of all the oil produced until it had received in addition to the $500,000 already paid, the full remaining consideration of $1,750,000 plus all operating and development costs paid after the completion of the fifth well, which was completed five days before the sale. The partnership never considered it had any claim against the purchaser or anyone else for any of the development or operating costs paid in connection with the lease in question, nor did it make any such claims against anyone. During 1919 it expended $267,425.41 in development and operation of the property, of which $141,168.11 was paid for the development of the first five wells, and $118,325.48 for operating expenses. During 1920 it paid operating expenses in the amount of $126,317.66. There were also other amounts paid for commissions and office expenses which appear in the findings of fact.

The parties to this proceeding agree that the profit from the sale in 1919 should be returned in accordance with the " return of capital " method. But the respondent has refused to consider, as a part of the capital to be returned to the partners, any part of the development or operating costs paid by the partnership subsequent to the completion of the fifth well on or about August 17, 1919. No reason for this refusal is given in his deficiency letter, but from the entire record we assume that he considered such costs as being chargeable to the Veritas Oil Corporation and that, if paid by the partnership, they should be treated by it as an account receivable due from the corporation. But the partners, notwithstanding the agreement of August 22, 1919, never asserted a right to reimbursement of the operating and development costs except as they were entitled to the proceeds from one-fifth of seven-eighths of the production, which they knew would never be sufficient. It was necessary to incur such costs before there could be further production.

Under such circumstances, we think that the partnership is entitled to a return of the part of such operating and development costs for each year which was in excess of one-fifth of seven-eighths of the oil produced before the profit, if any, for that year is determined. Such expenditures are comparable to commissions or other expenses paid in connection with a sale and as such should be applied in reduction of the sale price.

The repossession and resale of the property occurred subsequent to 1920, the year here in question, and is, therefore, not involved in these proceedings.

The net income of the partnership of Norton & Cline for the year 1920, determined in accordance with the foregoing, is $348,275.35 and is set forth in schedule form as follows:

| | | | |
|---|---|---:|---:|
| Cash and notes received in 1919 | | | $500,000.00 |
| Part purchase oil installments from ⅘ of ⅞ of production for 1919 | | | 62,478.37 |
| | | | |
| Total consideration received during 1919 | | | 562,478.37 |
| Less return of capital: | | | |
| Cost of lease | | $271,000.00 | |
| Development cost of first 5 wells | | 141,168.11 | |
| Commissions paid in 1919 | | 20,000.00 | |
| Development costs subsequent to first 5 wells paid in 1919 | $126,257.30 | | |
| Operating costs subsequent to first 5 wells paid in 1919 | 118,325.48 | | |
| | 244,582.78 | | |
| Deduct receipts from ⅕ of ⅞ of production for 1919 | 15,619.60 | | |
| | | 228,963.18 | |
| | | | 661,131.29 |
| | | | |
| Balance of capital to be returned in 1920 | | | 98,652.92 |
| | | | |
| Part purchase oil installments from ⅘ of ⅞ of production for 1920 | | | 473,980.41 |
| Less return of capital: | | | |
| Balance from 1919 above | | $98,652.92 | |
| Commissions paid in 1920 | | 16,551.20 | |
| Operating costs for 1920 | $126,317.66 | | |
| Deduct receipts from ⅕ of ⅞ of production for 1920 | 118,495.09 | | |
| | | 7,822.57 | |
| | | | 123,026.69 |
| | | | |
| Profit for 1920 | | | 350,953.72 |
| Deductions allowed partnership: Office expense previously referred to as "other deductions" | | | 2,678.37 |
| | | | |
| Net income of partnership for 1920 | | | 348,275.35 |
| Cline's ⅕ distributive share | | | 69,655.07 |

The fifth and last issue is whether the petitioners are entitled to a loss of Cline's investment of $33,960 in the one-fifth interest in the partnership of Simack Oil & Gas Co. upon his disposition of that interest to McDowell in December, 1920. Cline acquired the interest under an oral agreement and disposed of it in the same manner. The respondent contends that Cline's disposition of the interest in question was a gift rather than a sale, for the reason that no consideration moved from McDowell to Cline. With this we do not agree. One of the essential terms of the agreement between McDowell and Cline was that McDowell would be responsible for one-fifth of the future losses of the partnership if the latter continued to be unsuccessful. In our opinion, the transaction was a sale by Cline of his one-fifth interest in the partnership to McDowell and, since under the terms of the agreement Cline would never recover any part of his investment of $33,960, such investment represented a total loss. The petitioners concede, however, that the amount of $33,960 should be reduced by the amount of $9,547.31 already allowed by the respondent as representing Cline's pro rata part of the losses sustained by the partnership on its 1920 operations.

*Judgment will be entered under Rule 50.*